UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO


UNITED STATES OF AMERICA,   )
          Plaintiff,        )
vs.                         )  Case No. 1:18-cr-00281-EJL-2
CHANTELLE CHARNE ROBBERTSE, )
          Defendant.        )
_____)


SENTENCING HEARING
HELD BEFORE THE HONORABLE EDWARD J. LODGE
AT BOISE, IDAHO
JUNE 11, 2019


A P P E A R A N C E S


FOR THE PLAINTIFF:

HEATHER PATRICCO, AUSA
United States Attorney's Office
800 East Park Boulevard
Suite 600
Boise, ID 83712


FOR THE DEFENDANT:

JAY J. KIIHA
White Peterson Gigray & Nichols, PA
5700 E. Franklin Road
Suite 200
Nampa, ID 83687


Reported by:
Lisa K. Yant, CSR, RPR, CFRR
Official Court Reporter

P R O C E E D I N G S

June 11, 2019 – Boise, Idaho


1           THE CLERK:  The Court will now hear sentencing in

2   USA vs. Chantelle Charne Robbertse, Case No. 1:18-cr-281-EJL.

3           Counsel, if you will please state your appearances for

4   the record.

5           MS. PATRICCO:  Heather Patricco for the United States.

6   At counsel table with me HSI Agent Jarred Cronenworth.

7           MR. KIIHA:  Jay Kiiha on behalf of Chantelle

8   Robbertse.

9           THE COURT:  Thank you and good morning, Counsel.

10          MS. PATRICCO:  Good morning.

11          MR. KIIHA:  Good morning.

12          THE COURT:  Good morning, Ms. Robbertse.

13          THE DEFENDANT:  Good morning, Your Honor.

14          THE COURT:  Ma'am, the record shows that on

15   December 6th of last year you pled guilty to Count 31 charging

16   aggravated theft and/or aiding and abetting.  That plea was

17   entered pursuant to certain plea negotiations.  After the Court

18   accepted your plea, a presentence investigation was requested

19   and so ordered by the Court, and the matter has been continued

20   to this date for the purpose of sentencing.

21          Is that the way you recall the proceedings up to date?

22          THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  You have had an opportunity to go over the

2     report with your counsel before you made your appearance here

3     today?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  You understand, then, that the tentative

6     findings as to the recommended Guideline calculations are a

7     total combined offense level of -- actually none, criminal

8     history category I, which provides for a mandatory minimum

9     sentence of two years; one year of supervised release; a fine

10    range of $250,000; restitution in the amount $475,358.28; and, a

11    $100 special assessment.

12          Other than any written objections and/or motions that

13    may have been previously filed, do you have any dispute as to

14    the Guideline calculations?

15          THE DEFENDANT:  No, Your Honor.

16          THE COURT:  Are there any witnesses to be called?

17          MS. PATRICCO:  Your Honor, the government is not

18    calling any witnesses.  However, I do believe there are some

19    victims that would like to be heard.

20          THE COURT:  Any victims that wish to be heard, if they

21    will just come forward to the podium, please.  Come on up to the

22    podium and adjust that mic to your liking, and then just go

23    ahead and tell me what you want me to hear.

24          MR. KAPLAN:  Good morning, Your Honor.  Trevor Kaplan

25    here.

1          I have several victims that have asked me to speak on

2     their behalf because they cannot be here because they are out of

3     the country or somewhere else in the country.  I drove in from

4     Salt Lake City to be here this morning.

5          I'm not going to read my whole victim statement until

6     later, during Gloudina's sentencing.  I just want to speak on

7     behalf of specifically one of my friends, Petri Gilbert (phon.)

8     in South Africa, my ex-wife Renae Ducett, (phon.) and then

9     myself, because we seem to be the ones most affected by the

10    case.  Petri Gilbert was cheated out of his green card because

11    of all the activities of Gloudina and Chantelle.  Renae ended up

12    on a seven-day suicide watch because of PTSD, severe stress,

13    because of all the gossip, all the financial hardships we have

14    experienced.

15         Myself, I have lost out on the opportunity to open a

16    brokerage for National Life through PFA Financial Advisors in

17    Salt Lake City because the state of Utah would not allow me to

18    have my insurance license while this whole investigation was

19    ongoing because they didn't know if I was implicated and would

20    not -- National Life would not actually allow me to open a

21    brokerage until after the Court case was done.

22         This has cost me over the last few months several

23    thousand dollars.  I know the person that has taken the position

24    had an income of $25,000 last month.  And having dealt with this

25    family for the last 12, 13 years, thinking that we got rid of

1          them out of our lives, to be affected still so much later

2          because of this is really aggravating, it is frustrating.

3                    And it is -- part of being here today is a vindication

4          of seeing justice finally come to fruition and maybe a small

5          amount of closure to actually see this happen.  And the main

6          purpose of me speaking is so that you can see real people have

7          really been affected by the crimes committed, it is not just a

8          name on paper.  It is somebody that have had -- my children, my

9          ex-wife, myself -- our lives totally changed -- totally ruined

10         in the case of Petri Gilbert -- by this family.

11                   That is all I am going to say for now, Your Honor.

12         Thank you.

13                   THE COURT:  Thank you.

14                   The next gentleman, I think there was one other

15         person.

16                   MS. PATRICCO:  I think that is it for now, Your Honor.

17                   THE COURT:  Does the defense intend to call any

18         witnesses?

19                   MR. KIIHA:  No, Your Honor.  Thank you.

20                   THE COURT:  Does the government have a recommendation?

21                   MS. PATRICCO:  Yes, Your Honor.

22                   May it please the Court.

23                   THE COURT:  Counsel.

24                   MS. PATRICCO:  The government is requesting that the

25         Court sentence the defendant to a minimum term of two years

1    imprisonment for aggravated identity theft.  While 24 months is

2    the minimum mandatory sentence imposed by statute, it is also

3    justified by the facts, Your Honor, and let me tell you why that

4    is the appropriate sentence here.

5         The defendant and her mother engaged in a scheme to

6    defraud the California Employment Development Department, the

7    CEDD, an organization that aids disabled workers.  While the

8    government recognizes that the defendant Chantelle Robbertse was

9    not the mastermind behind the plan to defraud the CEDD

10   initially, she was a willing and knowledgeable participant over

11   several years.  The Government's acknowledgement of her slightly

12   lesser role is reflected in her plea to one count of aggravated

13   identity theft.

14        The plan, Your Honor, was to get the CEDD to pay out

15   money for false disability claims filed on behalf of unwitting

16   individuals.  This was a massive fraud scheme that involved

17   theft of over $475,000 from the state of California as well as

18   numerous identity theft victims.

19        It worked like this, Your Honor.  The defendant,

20   Chantelle Robbertse, and her co-defendant, Gloudina Robbertse,

21   filled out disability claim forms to obtain disability insurance

22   benefits with the CEDD.  These claims were submitted with the

23   identities of real persons without their knowledge.  The claim

24   forms that were filed included personal identifying information,

25   to include Social Security number, birth date, and names of

1       individuals.

2              During a search of the defendant's residence, Your

3       Honor, agents found multiple pages of defendant's handwritten

4       notes with personal identification of victims of the fraud

5       scheme.

6              Defendant and her co-defendant, Gloudina Robbertse,

7       used the names of physicians they found online to substantiate

8       the claims for disability.  After filing the fraudulent claim

9       forms, Defendant routinely checked on the status of the false

10      claims that were filed.  A review of one of her computers

11      revealed that during a two-month period, at the end of 2017 and

12      beginning into 2018, claims, false claims, were checked over 300

13      times.

14             Once the claim form was approved by the CEDD, the CEDD

15      would load a debit card with money so that when they sent it to

16      a claimant, that claimant could withdraw the money at a bank of

17      their choosing.  The debit cards had the names of the claimants

18      on the front of the card.  These debit cards were sent to one of

19      several commercial mailboxes utilized and paid for by the

20      defendant's co-defendant, her mother, in furtherance of the

21      fraud.

22             The debit cards were then sent to mailboxes in Idaho.

23      Defendant and/or her co-defendant would pick up the cards from

24      the mailboxes, activate the debit cards, establish a PIN number

25      for these debit cards.  The PIN number was the same for all the

1    debit cards; it made it easy to remember.

2            Thereafter, defendant withdrew the money from the

3    debit cards at banking institutions in California and/or the

4    District of Idaho for her own personal use.  A search of the

5    defendant's residence in February 2018 revealed 11 CEDD debit

6    cards in the names of victims of the fraud scheme.

7            This was a fraud that continued over a period of years

8    and would not have stopped had agents not uncovered it.

9            Review of the electronic media, Your Honor, of the

10    defendant and co-defendant, revealed hundreds of messages

11    discussing the use of commercial mailboxes, withdrawals from the

12    CEDD debit cards of victims and their concern over victim claims

13    being under review by the CEDD.

14            Review of the claims occurred, Your Honor, when the

15    CEDD became suspicious of a claim and was looking into the

16    veracity of that claim.  One such example is set forth in the

17    government's sentencing memorandum of the co-defendant in this

18    case.  In that example, defendant and her co-defendant discussed

19    splitting up the money, how to continue their fraud if certain

20    claims were discovered.  And specifically the defendant here,

21    Your Honor, not her mother, suggested moving cities, getting new

22    post boxes, a new company, and new people whose identities could

23    be used.

24            While it is true, Your Honor, that a parent often

25    exercises great control over a young person, the text messages

1    between the defendant and her mother do not suggest that the

2    defendant here was forced or even coerced into continuing the

3    fraud.  The defendant, like her mother, liked the money.

4    Despite the claim in the defendant's sentencing memorandum that

5    she saw little benefit from the money, text messages between the

6    co-defendant suggests otherwise.

7            Defendant's conduct was serious and caused credit and

8    other financial issues for victims of this scheme.

9            Your Honor, the defendant is a lawful permanent

10   resident currently in the United States.  She obtained an

11   Associate's degree in business from a community college in

12   California, and she is currently attending Boise State

13   University classes in international business and behavioral

14   analysis.

15           The defendant knew what she was doing was wrong.  In

16   October 2018 the defendant was also charged with 28 counts of

17   fraud in Riverside, California related to her fraudulent filed

18   claims under the California Employment Insurance Code.  The

19   defendant's actions and words show that she was a willing

20   participant in the fraud scheme and not a bystander with the

21   inability to stop.

22           A sentence of two years, Your Honor, can provide

23   deterrence to others from engaging in this type of conduct and

24   send a message to this defendant that her actions will not be

25   tolerated and that such actions have criminal consequences and

1          that she must have respect for the law.

2                    Accordingly, Your Honor, the government recommends a

3          sentence of the minimum mandatory of 24 months in prison.

4                    Thank you, Your Honor.

5                    THE COURT:  Thank you.

6                    Mr. Kiiha.

7                    MR. KIIHA:  I think the majority of what I wanted to

8          say here today, Your Honor, is in the sentencing memorandum that

9          was previously provided to the Court.  I would supplement that

10         with a few statements and maybe explain what I meant a little

11         bit better perhaps than originally stated.

12                   This is obviously a min/max sentence.  We are limited

13         at 24 months here, Your Honor.  And I think that my client

14         recognizes -- in fact, I know she recognizes -- that at least to

15         a large extent this is a demonstration on behalf of the United

16         States recognizing her more minor role in the instance.  I know

17         when I ran Guidelines calculations originally with how this was

18         charged with wire fraud, we were looking somewhere between six

19         and eight years, depending on how you laid things out.

20                   The reason I mention that, at least as far as my

21         client is concerned, Your Honor, this is aberrant behavior.  She

22         has a criminal history level of one.  There is not so much as a

23         parking ticket that is reflected in her presentence report.  And

24         I think it is beyond dispute that whatever Chantelle knew about

25         this fraudulent scheme, she arrived at the station rather late

1    in the process.

2          I think in a lot of ways -- one of the things I really

3    tried to do, Your Honor, is I tried to come up with a motive as

4    to how Chantelle became involved in this case and what she knew.

5    I realize the United States disputes that she profited -- that

6    she didn't profit from this.  I don't think anybody would

7    dispute that whatever money she made, it was very, very little

8    in the context of whatever fraudulent scheme, $475,000-odd

9    dollars, was taken.  So I really had to look deep to try to find

10   a reason why someone would get involved so deeply with so little

11   real benefit to themselves.

12         So one of the first things I did is I contacted a

13   psychologist and had him perform a psychological evaluation.

14   The Court does not have that, but it doesn't really say

15   anything.  It simply says she is a young woman, college student,

16   who is suffering from anxiety on the basis of what any

17   reasonable person would suffer anxiety from, which is being here

18   today.

19         So I think, at least the explanation I would give to

20   the Court and I think as Chantelle sits with this and has sat

21   with this for some time, the explanation is this:  Chantelle

22   sits between two worlds, Your Honor.  She is a permanent lawful

23   resident of the United States, but she came here when she was

24   four years old.  She is by all intents and purposes American,

25   and yet at the same time she is South African, she sits in that

1    world as well.  She was raised with their customs and

2    traditions.

3            And more importantly, she was raised in the context of

4    an origin story where her mother essentially is the head of the

5    family and the matriarch of the family who came from a

6    strife-torn nation where Chantelle's grandfather, where

7    Gloudina's father, was murdered.

8            When the family came to the United States, they were

9    briefly homeless.  They were subject to all of the typical type

10   of struggles.  My family is an immigrant family as well, I can

11   speak to this, of difficult employers, adapting to the language,

12   of surrounding yourself with customs perhaps of your American

13   classmates who observed customs and holidays you don't adapt to.

14           And I think what happens in this process, and I think

15   what happened to Chantelle, is her mother became a heroic

16   figure, she worked for her mother, and by the time that it

17   became apparent to Chantelle that this fraudulent scheme

18   existed, she was placed in the position that I think no one

19   would ever want to be placed in, which is to turn one's parent

20   in or to attempt to end whatever activity was taking place, and

21   she just simply wasn't brave enough to do so.

22           And I think, speaking of the text messages as they go

23   back and forth, it is true there are text messages that would

24   seem to suggest that the parties didn't want to be arrested,

25   they did not want the investigation to end unfavorably to them.

1    But there are also text messages from Chantelle and statements

2    she made to her mother where she said, Hey, maybe this is a sign

3    we should just end this right now, but she just wasn't brave

4    enough.  So I think the Government recognizes that and that is

5    why she is faced with what she is faced with.

6         It is interesting, Your Honor, I know the sentencing

7    factors really don't come into play here, it is just a result of

8    how this is being sentenced.  But I think, and I have seen

9    genuine remorse in my client, and I have seen her, like any

10   other young person, she says she wants to reset things back to

11   the way they were before she ended up in this courtroom.

12        So she wants me to ask you, Your Honor, and I know the

13   statute doesn't provide for this, but I told her I would ask

14   you, and I think it reflects how remorseful she is, she says, Is

15   there any way I can be punished but I can still have my child?

16   Can I still have my four-year-old daughter?  Can I be under home

17   confinement?  Will you sentence me and let me finish school at

18   least first, and then impose my sentence and do all of those

19   things.  And it is reflective of the deep, deep sorrow that she

20   has relating to this case.

21        She has tried to set things right in the interim

22   period.  She has acted as caregiver and guardian to Navaeh and I

23   mentioned that in the sentencing brief.  She has worked in the

24   interim period, she has worked two or three jobs, in fact, up

25   until this time.  She has tried to place as much of her life as

1       she can in order so when she does get out of serving her time,

2       she can finish her school as best as she can.

3               I cannot tell you, Your Honor, how deeply terrible and

4       remorseful she feels about all of this.  She would ask for the

5       mercy of the Court and she would ask for the Court's

6       understanding, most of all, as to why she did what she did.  And

7       she certainly accepts that she just wasn't brave enough at that

8       critical moment, Your Honor.

9               Thank you, sir.

10              THE COURT:  Thank you.

11              Ms. Chantelle Robbertse, do you have anything you

12      would like to say to the Court?

13              THE DEFENDANT:  No.  Thank you, Your Honor.

14              THE COURT:  Well, the Court obviously has spent a

15      considerable amount of time going through the file, the letters

16      that have been written, the complexity of the issue, it speaks

17      for itself.  But in this case, ma'am, you are obviously getting

18      a real break.

19              When you look at it at first blush, you would think

20      the sentence would be much higher than what is being suggested.

21      The Court itself is against mandatory sentencing, but in this

22      case, it doesn't, in my judgment, really speak to the issue.

23      That is, this is the type of crime where a lot of thought has to

24      be put into it.

25              I understand the argument concerning your mother and

1   her control and the problems that you were confronted with of

2   being a new person in this country and the problems that existed

3   in the family, the murder that took place and all those issues,

4   but I also know or understand that you are very smart.  You are

5   doing extremely well in school and you have a lot to look

6   forward to.

7           Good judgment comes from experience and a lot of

8   experience comes from bad judgment.  You had that bad judgment

9   and hopefully you will learn from that experience and become

10  even a better person than you might have otherwise been.

11          But there are a lot of people that have been hurt,

12  seriously hurt, in this case.  It goes far beyond just money.

13  People think they have money and then they are confronted with

14  the fact that something hasn't been paid or there is not money

15  to cover things.  There is just a lot of embarrassment, a lot of

16  time spent trying to figure out where the money is.

17          Even though you have your status that exists at the

18  present time, you are likely going to be deported.  And that is

19  a form of punishment, in my judgment, particularly when you have

20  lived like you have in this country for as long as you have.

21          But you can't bog down in self-pity.  You have other

22  people to think about.  You have your daughter.  If wishes were

23  horses, beggars would ride.  You just have to face the facts and

24  rise above them and become a stronger person.  You learn from

25  your mistakes hopefully.

1          You are going to prison.  It is not for a long period

2   of time, but you don't waste even one minute while you are

3   there.  You work towards -- you are likely going to have an

4   opportunity at some time to finish your education, but even

5   while you are in prison you can be doing something about that.

6   Your daughter, hopefully, can be placed somewhere you are

7   comfortable with.

8          But again, you just simply cannot bog down and feel

9   sorry for yourself because you have heard the witness speak, you

10  heard the government talk about the issue.  This is something

11  that took a lot of thought.  Actually, a lot of manipulation.

12  So many people come before the Court that just have done

13  something out of anger or something that happened real quick and

14  it is not indicative of what that person is really like.

15         In this case, I think a strong argument can be made

16  for the fact that, at least in this case, you were using

17  extremely bad judgment and you knew there was going to be a day

18  of reckoning.  It just couldn't go on forever.  We are talking

19  about $475,350 that has to be paid.

20         It is true, it is going to be difficult probably to

21  collect it from or any portion of it maybe from you because of

22  the fact that you may be deported.  It may be something that is

23  difficult, but it is going to be there.  It is a roadblock.  If

24  you were allowed to come back into this country and did so

25  correctly, you are still faced with the money judgment.  It is

1    going to be there and it is going to be a stumbling block.  It

2    is just simply something that is going to have to be thought

3    about and taken care of to the best of your ability.  You are a

4    smart person.  Your future is ahead of you.

5              I guess what I want to say is we just simply can't

6    change the past, but we can start where you are today and change

7    the future by doing the right thing and thinking beyond the end

8    of your nose before you let somebody else control your actions

9    or your judgment.

10             In this case, the Court, as you have heard, really has

11   little or no discretion.  So the Court is going to sentence you

12   to the Bureau of Prisons for two years, 24 months, on Count 31

13   to be followed by one year of supervised release.  You must

14   comply with all mandatory, standard and special terms of

15   supervised release as stated in Part D of the presentence

16   report.  The Court is going to strike, however, the drug

17   testing, mandatory drug testing.  That doesn't appear to be an

18   issue.  It is costly and simply not necessary, so that is going

19   to be eliminated.

20             Counts 1 through 30 and 32 through 37, the government

21   is moving to dismiss?

22             MS. PATRICCO:  Yes, Your Honor.

23             THE COURT:  So ordered.

24             How about the $100 special assessment?  Any thought on

25   that?

1          MS. PATRICCO:  I think we will leave that in place,

2     Your Honor.

3          THE COURT:  You are going to have to pay a $100

4     special assessment.  It is miniscule compared to what has

5     happened here.  It is something that is not mandatory, but it is

6     paid by most all defendants.

7          To the extent that you might otherwise disagree with

8     the Court's judgment, you have 14 days in which to appeal.  You

9     do that by filing your notice of appeal with the clerk of the

10    court in this district.  Otherwise it is waived, meaning it is

11    gone.

12          Do you have any questions at all?

13          THE DEFENDANT:  No, Your Honor.

14          THE COURT:  There is no fine.

15          MR. KIIHA:  Your Honor.

16          THE COURT:  Yes, counsel.

17          MR. KIIHA:  I wasn't sure I made it clear.  We would

18    ask that the state agree to allow Chantelle to self-report, and

19    we would just ask the Court of a recommendation where she is

20    placed, that she is placed in the same prison as her mother,

21    Your Honor.

22          MS. PATRICCO:  Yes, Your Honor.  We have said that

23    self-reporting is fine.  Your Honor, we just want to make sure

24    the defendant stays in contact with her counsel and that there

25    is no issue about when and where she needs to report so she can

1    do that in a timely fashion, Your Honor.

2         THE COURT:  Ma'am, this ordinarily is not done, and I

3    am hopeful that you have already made plans as far as your

4    daughter, things of that nature, but the Court, since there is

5    no objection, is going to allow a voluntary surrender.  You will

6    probably get that notice in two to four weeks.  If you haven't

7    received it, get ahold of your counsel because I don't want

8    anything to go wrong.  It will tell you where to report.  If you

9    do not have the ability to report to that designation, then you

10   turn yourself in to the Marshals Service and the Marshals

11   Service transports you.

12        I know your counsel has undoubtedly talked to you

13   about this, and I am not suggesting that you would, but if you

14   fail to appear, that is a separate offense and most likely would

15   result in a consecutive sentence, meaning on top of.  So just

16   stay in contact with your counsel and report when designated to

17   do so and make sure that nothing goes awry during this interim

18   period.  The Court reserves the right to terminate that release

19   forthwith if the Court has any reason to be concerned about the

20   same.  Okay?

21        THE DEFENDANT:  Okay.  Thank you, Your Honor.

22        THE COURT:  Good luck to you.

23        The restitution, of course, is $475,350.28 and that is

24   an obligation to be paid.

25        (Proceedings concluded at 10:38 a.m.)

REPORTER'S CERTIFICATE

I, LISA K. YANT, CSR, RPR, CFRR, certify that the foregoing is a correct transcript of proceedings in the above-entitled matter.

/s/  Lisa K. Yant                          05/04/2020

LISA K. YANT, CSR, RPR, CFRR                Date